Submitted on brief May 2, affirmed May 23, 1916.

## BESSLER *v.* DERBY.

(157 Pac. 791.)

**Corporations—Agents—Authority.**

1.   Where a corporation did not clothe its agent with the written authority required by Section 808, subdivision 7, L. O. L., declaring that a contract by an agent for the sale of land shall be void unless in writing, and did not grant the agent permission in any way to contract for the sale of its land, one contracting for purchase of land from the corporate agent is bound at his peril to ascertain the agent's authority.

> [As to necessity that agent have written authority to make memorandum required by statute of frauds, see note in **Ann. Cas.** 1912B,  1295.]

**Corporations—Agents—Authority.**

2.   One contracting to purchase land with a corporate agent with knowledge that the agent was not authorized to sell, cannot enforce the contract against the corporation.

**Corporations—Agents—Ratification of Contract.**

3.   Where a corporate agent without authority attempted to contract to sell land belonging to the corporation, and when notified the officers of the corporation disavowed the unauthorized sale, the fact that the purchaser allowed the corporation to retain the money, though the agent offered to return it, did not effect a ratification of the contract.

From Baker: GUSTAV ANDERSON, Judge.

In Banc.   Statement by MR. JUSTICE HARRIS.

This is a suit by Thomas Bessler against R. W. Derby, substituted for the Powder River Gold Dredging Company, a corporation, Hewitt Land Company, a corporation, and the Sumpter Lumber Company, a corporation.

The plaintiff is attempting to quiet his claim of title to a small tract of land which he asserts the Sumpter Lumber Company agreed to sell to him.   The land lies partly in the northeast quarter of the northwest quarter, but mostly in the southeast quarter of the northwest quarter of a certain section in Baker County.

80 Or.—33

Four corporations were named as defendants: The Powder River Gold Dredging Company, the Mercantile Trust Company, Hewitt Land Company, and the Sumpter Lumber Company. R. W. Derby was afterward substituted as a party defendant for the Powder River Gold Dredging Company and the Mercantile Trust Company. The Hewitt Land Company and the Sumpter Lumber Company answered jointly while R. W. Derby filed a separate answer. The record title to all the land claimed by plaintiff is in the name of R. W. Derby, who claims ownership of the portion in the northeast quarter of the quarter-section by mesne conveyances from the government and traces title in the remainder to the Sumpter Lumber Company. The Sumpter Lumber Company held the record title to the southeast quarter of the quarter-section until March 19, 1907, when it conveyed to the Hewitt Land Company, which in turn transferred the title on April 16, 1915, to the Powder River Gold Dredging Company, and the last-mentioned company subsequently conveyed its interest to R. W. Derby. The plaintiff traces any right that he may have to Fred Phillips, P. J. Brown, Frank Geddes and John Stenoff, who were partners in the meat and butchering business, and for the sake of brevity they will be called the partnership. About May 1, 1906, the partnership sold its business and rights to W. P. Smith and Thomas Mack, who were doing business as Smith & Mack, and subsequently Mack sold to Smith. The plaintiff afterward acquired all the interest owned by Smith. After alleging that the Sumpter Lumber Company agreed to sell the land involved in this suit to the partnership, and that notwithstanding the payment of the purchase price the Sumpter Lumber Company and its successors, who had notice of the agreement, have refused to make a con-

veyance to the partnership or any of its successors, the plaintiff prays that the defendant be required to execute a deed to him, and that the title be quieted in him.   The defendants denied that the Sumpter Lumber Company agreed to sell the land.   A trial resulted in a decree dismissing the suit, and the plaintiff appealed.

Submitted on briefs under the proviso of Rule 18: 56 Or. 622 (117 Pac. xi).                        AFFIRMED.

For appellant there was a brief submitted over the names of *Mr. John L. Rand* and *Mr. A. A. Smith.*

For respondents there was a brief over the names of *Messrs. Clifford & Correll* and *Mr. Leon W. Behrman.*

MR. JUSTICE HARRIS delivered the opinion of the court.

The Sumpter Lumber Company was operating a mill in Sumpter with George Blanchard employed as a bookkeeper; and, while he "wasn't really manager" or an officer of the company, he had charge of the mill, planer and commissary.   Seymour H. Bell, a stockholder who resided in Sumpter, cruised and purchased timber for the company.   The officers of the Sumpter Lumber Company lived in Tacoma, Washington.   The partnership instructed Stenoff to find a suitable site for the erection of a slaughter-house to be used in connection with the meat business, and he accordingly interviewed Blanchard with reference to the purchase of a tract pointed out by the latter, and in the month of February, 1905, they "came to an agreement as to price and terms."   The price was $250 and the terms required the payment of monthly installments of $25. Blanchard had no written or other authority to sell land belonging to the company, nor did he represent

to Stenoff that he possessed such authority. Indeed, Stenoff knew that Blanchard was without authority to make any agreement to sell the land. Although Blanchard told Stenoff that he felt sure that the deal would go through, nevertheless he declined to give Stenoff a written agreement of sale, for the reason that he "had no authority to make it, and I tells him, 'I will receipt you for the money.' " Blanchard did not report at once to the officers at Tacoma, but merely informed Bell of the transaction and requested the latter, who "had a good deal of correspondence with reference to buying timber, * * in his correspondence to notify Mr. Hewitt, an officer of the company, and he said he would attend to it."

The partnership took possession of the land, and early in the spring of 1905 had fenced the tract and completed a slaughter-house, and ever since that time the partnership and its successors have had possession of the premises and used them for slaughtering animals. Blanchard believed that the agreement was advantageous to the company, and consequently he thought that it would meet with the approval of the officers of the Sumpter Lumber Company; it is also probable that Stenoff entertained the same belief; and these circumstances may account for the fact that Stenoff paid the first installment soon after agreeing on the terms and price with Blanchard and subsequently paid the remaining installments, the final payment being made in March, 1906. Blanchard testified that:

"Before Mr. Stenoff made the last payment he told me he was ready to pay the other one any time if I would send to Mr. Hewitt and get a deed. * * They wrote to Mr. Hewitt for a deed and Mr. Hewitt wrote back absolutely refusing to sell it because he wanted it

to use at some future time for a mill site and they wouldn't sell it."

Blanchard says that he informed Stenoff of the refusal of Hewitt, the president, to sell, and also "told Mr. Stenoff that I felt Mr. Hewitt had the wrong impression of the value of the ground; that he thought it was down there where it was suitable for a sawmill site, and I felt sure that if when he came down and saw the ground and its worthlessness, there would be no trouble in getting a deed."

The plaintiff argues that Blanchard could not have had this conversation with Stenoff, on the assumption that it occurred after April 16, 1906, the date of the letter addressed to Blanchard by Hewitt, and therefore after Stenoff had left the country. Blanchard testified, however:

That the conversation occurred before he received the letter of April 16, 1906; that "it was after the conversation when he had told me he was ready to make the final payment for the deed. I don't know January or February after the previous letter had been written, asking for a deed," and "before I wrote this letter referred to in defendant's Exhibit 1 I wrote myself to Mr. Hewitt."

At some time between May 1, 1906, and the fall of that year when Blanchard moved away from Sumpter, W. P. Smith talked with Blanchard about a deed, and the latter, when referring to this talk, testified:

"I told him I thought I could [get a deed] just to let it go until I got young Mr. Hewitt down and I felt sure when he saw the ground and thoroughly understood it wasn't good for a sawmill site I believed he could get a deed."

No demand has ever been made for a return of the money, although Blanchard offered to return all the money when he ascertained that he "couldn't get a

deed for Stenoff." The president having written a
letter saying that the company would not sell but would
lease the premises, Blanchard not only told Stenoff
that he would return the money, but he offered to "give
him a lease or anything that would protect him." The
transfer from the partnership to Smith & Mack and
the assignment from Smith were in the form of a bill
of sale, and neither grantor attempted to convey the
premises by a deed or to do more than assign any
existing right to a deed. Both Smith & Mack and the
plaintiff had actual knowledge before purchasing that
the partnership did not have a deed to the land, and
that there was trouble about the title. From 1903 to
1906 the taxes on the land were paid by the Sumpter
Lumber Company, and from 1906 to 1914 by the Hewitt
Land Company. The plaintiff stands in the shoes of
the partnership; for the purposes of this discussion
it will be assumed that Derby had no greater right
than the Sumpter Lumber Company had when it sold
to the Hewitt Land Company; and therefore the con-
troversy may be treated as though it were a contest
between the partnership and the Sumpter Lumber
Company.

1, 2. The possession of plaintiff and his predeces-
sors coupled with the improvements might warrant the
granting of relief to plaintiff if such possession and
improvements are referable to a contract originally
authorized or afterward ratified by the Sumpter Lum-
ber Company. The contract relied upon by the plain-
tiff, however, was neither authorized nor ratified by
the company. Stenoff was acting as the representa-
tive of the partnership, and consequently the partner-
ship is deemed to have knowledge of whatever the
representative knew. Even though Stenoff actually
believed that Blanchard had authority to make the oral

agreement which Blanchard says he made, neverthe-
less, Stenoff was bound at his peril to ascertain the
extent of the authority exercisable by Blanchard: *Reid*
v. *Alaska Packing Co.*, 47 Or. 215 (83 Pac. 139); *Baker*
v. *Seaweard*, 63 Or. 350 (127 Pac. 961). The agent
was not clothed with the written authority required by
subdivision 7 of Section 808, L. O. L., nor did the com-
pany grant him permission in any way to contract for
the sale of its land; moreover, Stenoff actually knew
that Blanchard was without power to make a contract
binding the principal to sell its real property, and
consequently the agreement made by Blanchard and
Stenoff was not in the beginning an agreement made
by the company or binding upon it: *Foster* v. *Virtue*,
17 Or. 607 (22 Pac. 113).

3. The principal did not expressly or impliedly
ratify the unauthorized agreement, but, on the con-
trary, when notified of the transaction, the president
immediately disavowed the unauthorized act of the
agent and Stenoff was promptly informed of such dis-
avowal. The retention of the moneys paid to the com-
pany did not work a ratification. Blanchard offered
to return the money or to rent the land, and no one
ever demanded that the money be returned. Blan-
chard thought, and Stenoff hoped, that when the offi-
cers came to Sumpter and saw the land a deed would
be executed; the partnership neither demanded nor
accepted a return of the money, although Blanchard
offered to return it. The members of the partnership
were satisfied to leave the money with the company,
and they were willing to take any risk involved, feel-
ing, in the language of Blanchard, that "it would all
come out in the wash." The fact that they have been
disappointed does not warrant the granting of the re-
lief asked for. The agreement relied upon by the

plaintiff was neither authorized nor ratified, and, therefore, in legal contemplation, there was no agreement on the part of the owner of the land. The shoes of the partnership measure the right of the plaintiff, because there are no circumstances giving to the latter any greater right than his first predecessor. It is true that the plaintiff alleges that his claim of title has been ripened by adverse possession; but, even though it be assumed that the possession has at any time been adverse, the testimony fails to show that such adverse possession has continued for the requisite period of time.

The plaintiff is not entitled to any of the relief prayed for, and the decree is therefore affirmed.

AFFIRMED.

Mr. JUSTICE EAKIN absent.